UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
    )
            v.     )     No. 2:20-cr-00003-JAW-3
    )
GILBERT REYES     )

**ORDER ON MOTION TO SUPPRESS**

Having reviewed all the circumstances surrounding a defendant's statements to law enforcement both at the time of his arrest and after his federal indictment, the Court concludes that the government has demonstrated that the defendant knowingly, intelligently, and voluntarily waived his constitutional rights, including his right to counsel, and the Court therefore denies his motion to suppress evidence of his statements.

## I.   BACKGROUND

### A.   Procedural Background

On December 6, 2019, the Government initiated a criminal complaint against Gilbert Reyes, charging him with conspiring with others on or near November 26, 2019, to defraud by the use of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2). *Crim. Compl.* (ECF No. 1). On January 9, 2020, a federal grand jury indicted Mr. Reyes on the same charge. *Indictment* (ECF No. 15). On June 1, 2020, Mr. Reyes filed a motion to suppress "all statements made by" him. *Mot. to Suppress* at 3 (ECF No. 68) (*Def.'s Mot.*). The Government responded on June 17, 2020. *Gov't's Opp'n to Def.'s Mot. to Suppress* (ECF No. 70) (*Gov't's Opp'n*). Mr. Reyes replied on July 1, 2020. *Reply: Re: Mot. to Suppress* (ECF No. 71) (*Def.'s Reply*).

### B.    Factual Background: An Overview[1]

At approximately 5:15 p.m. on November 26, 2019, an employee of the Home Depot on Mount Auburn Avenue in Auburn, Maine, notified the Auburn Police Department that two men had suspiciously attempted to buy power tools and Wi-Fi equipment using newly-opened credit accounts. *Gov't's Opp'n* at 1. The employee told the police that the two men had entered a minivan and gave a description of the van and its license plate to the police. *Id.* at 1-2. Shortly after, Auburn Police Detective Marshall McCamish pulled the van over. *Id.* at 2.

Three men occupied the van: the two men who had been seen in the Home Depot and a driver. *Id.* Gilbert Reyes was a passenger in the van that law enforcement stopped in the parking lot of the Home Depot store in Auburn. *Def.'s Mot.* at 1; *Gov't's Opp'n* at 2. Law enforcement removed Mr. Reyes from the vehicle and questioned him concerning his activities in the state of Maine. *Def.'s Mot.* at 1. Specifically, Detective McCamish removed Mr. Reyes from earshot of the other men and asked him whether he wanted to "give him his side about what happened" at Home Depot, emphasizing repeatedly to Mr. Reyes that it was "totally up to" him whether he wished to speak to Detective McCamish. *Gov't's Opp'n* at 2. Detective McCamish gave Mr. Reyes his *Miranda*[2] warnings and Mr. Reyes said that he

---

[1]    In reciting the facts, the Court assumes the accuracy of the factual representations in Mr. Reyes' and the Government's memoranda and it has incorporated, as appropriate, the exhibits the Government attached to its memorandum as well as transcripts of those interviews that the Government provided, *Gov't's Opp'n to Def.'s Mot. to Suppress*, Attachs. 1-2 (ECF No. 76), the accuracy of which Mr. Reyes has not objected to.

[2]    *Miranda v. Arizona*, 384 U.S. 486 (1966).

understood. *Id.* Mr. Reyes said that despite his right to remain silent, he would talk about his own involvement but not the involvement of his friends. *Id.*

Mr. Reyes made inculpatory statements after being informed he would benefit[3] if he admitted his conduct. *Def.'s Mot.* at 1; *Gov'ts Opp'n* at 5. Similar inducements were offered a co-defendant, who was arrested at the same time. *Def.'s Mot.* at 1. On January 15, 2020, having been released on state bail and having returned to the state of Maine for a state court date, Mr. Reyes was taken into federal custody and questioned by a federal agent. *Id.*, *Gov't's Opp'n* at 3.

## II.   THE PARTIES' POSITIONS

### A.   Gilbert Reyes' Motion

In his motion to suppress, Mr. Reyes reviews the facts and applicable law and states that the Auburn police obtained his first statement on the promise of "substantial benefits" and that the "taint from the first violation continued to impact upon the legality of the subsequent statements, although there were also independent inducements offered which impacted upon the legality of [Mr. Reyes'] statements." *Def.'s Mot.* at 1-2.

### B.   The Government's Opposition

The Government attached to its response an audio recording of the first interview by Detective McCamish and a video and audio recording of the second interview by Agent Martin. *Gov't's Opp'n*, Attach. 1, *Ex. 1* (*Filed in Hand*) (*McCamish*

---

[3]      Mr. Reyes claims he was informed he would receive "substantial benefits" if he cooperated. *Def.'s Mot.* at 1. The Government denies that he was offered "substantial benefits" before speaking with Detective McCamish. *Gov't's Opp'n* at 5. For purposes of summarizing the facts in this case, the Court uses the term, "benefits," and later presents the actual words, which control.

*Interview*); *Gov't's Opp'n*, Attach. 2, *Ex. 2* (*Filed in Hand*) (*Martin Interview*).  After the Court ordered the Government to prepare transcripts of the traffic stop and later interview, the Government filed transcripts on July 21, 2020.[4]  *Gov't Opp'n to Def.'s Mot. to Suppress*, Attach 1, *Ex. 1T* (*Tr. of 11/26/2019 Traffic Stop*) (*Traffic Stop Tr.*); *Gov't's Opp'n to Def.'s Mot. to Suppress*, Attach. 2, *Ex. 2T* (*Tr. of 01/15/20 Interview with Gilbert Reyes*) (*Martin Interview Tr.*).

In its response, the Government argues that Mr. Reyes voluntarily gave all his statements both during the traffic stop and later at the police station interview. *Gov't's Opp'n* at 4-10.  The Government says that a defendant's statement to law enforcement is involuntary only if the defendant's will was overborne and to make this determination a court should look at the totality of the circumstances.  *Id.* at 5. The Government views law enforcement statements to Mr. Reyes as encouragements to tell the truth, suggestions that honesty will be a benefit to him, and promises to bring his cooperation to the attention of the prosecutor, none of which, it says, is individually or cumulatively violative of a defendant's rights under applicable First Circuit law.  *Id.* at 5-6.  Despite Mr. Reyes' claim that he was offered "substantial benefits," the Government says that the transcript reveals no such offer.  *Id.* at 6. The Government distinguishes the cases that Mr. Reyes cites in support of his motion. *Id.* at 6-8.  It then analyzes Mr. Reyes' background and concludes that based on his age, education, and prior experience with law enforcement, Mr. Reyes made his

---

[4]     In its July 13, 2020, order, the Court allowed Mr. Reyes three days to interpose an objection to the accuracy of the transcripts.  *Order* (ECF No. 73).  He did not object and therefore the Court assumes that the transcripts of both the traffic stop and the later interview are accurate.

statements voluntarily. *Id.* at 8. Also, the Government notes that on both occasions law enforcement gave Mr. Reyes *Miranda* warnings before he began talking. *Id.* at 8-9.

The Government also disputes Mr. Reyes' claim that his statements at the police station were tainted by his statements during the traffic stop even if the traffic stop statements were made involuntarily. *Id.* at 9. The Government points to the timing of the two statements, the different locations of the two statements, and the different investigating officers. *Id.* Again, the Government maintains that Mr. Reyes voluntarily gave his statements at the police department. *Id.* at 9-10.

Finally, the Government asserts that Mr. Reyes waived his right to counsel when he spoke to law enforcement after being given his *Miranda* warnings. *Id.* at 11-12.

### C. Gilbert Reyes' Reply

In reply, Mr. Reyes emphasizes the "critical point" that he stated "many times" that he did not wish to be arrested and/or held in custody and the officer pressed the notion that if Mr. Reyes cooperated, he might be released on bail. *Def.'s Reply* at 1. Mr. Reyes also points to conversations that law enforcement had with one of the co-defendants. *Id.* at 2. He then highlights some additional conversations between the law enforcement officers and himself. *Id.* He then seems to argue that because state of Maine standards for voluntariness are stricter than the federal standards, the Court should either apply the Maine standards or take the Maine standards into account in determining whether to suppress the evidence. *Id.* at 3.

5

## III.   LEGAL STANDARDS

The law applicable to a defendant's statements while in custody is well-developed. "*Miranda* and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights—including the right to remain silent and the right to consult an attorney—before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020) (citing *United States v. Hughes*, 640 F.3d 428, 434 (1st Cir. 2011); *United States v. Conley*, 156 F.3d 78, 82 (1st Cir. 1998)). "Absent such warnings, most statements that officers obtain during a custodial interrogation are inadmissible at trial." *Id.* (citing *Conley*, 156 F.3d at 82). "Once a suspect is advised of his *Miranda* rights, though, he may waive those rights and consent to an interrogation." *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)).

Even after a suspect has been informed of his *Miranda* rights and has spoken with law enforcement, courts "must ask whether, appraised in light of all the circumstances, the waiver was both knowing and voluntary." *Id.* at 26 (citing *United States v. Bezanson-Perkins*, 390 F.3d 34, 39-40 (1st Cir. 2004)). The First Circuit cautioned that an "inquiring court must start with the presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence." *Id.* (citing *United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003)).

## IV.   THE TRANSCRIPTS

### A.   The Traffic Stop

The transcript of the traffic stop begins with Detective McCamish's discussions

with the driver of the motor vehicle.  *Traffic Stop Tr.* at 2:01-8:05.

#### 1.   The Initial Conversation, Pat Down, and Reason for Stop

During the end of that initial conversation, Detective McCamish was joined by

Officer Schroeter.  *Id.* at 7:17-8:05.  It appears that Officer Schroeter took control of

the others and Detective McCamish spoke directly with Mr. Reyes, separating him

from the others:

> [DETECTIVE McCAMISH:]  Go ahead and step out here with that real
> quick and I'll just talk to you back here.  You don't have any weapons on
> you, do you?  Are you okay with me patting you down?  It's totally up to
> you.
>
> GILBERT REYES:  What happened?
>
> DETECTIVE McCAMISH:  Is it okay with you if I pat you down?
>
> GILBERT REYES:  Oh, sure sure.
>
> DETECTIVE McCAMISH:  It's okay?  Okay.  I just want to make sure.
>
> GILBERT REYES:  No worries.
>
> DETECTIVE McCAMISH:  Nothing going to stick me, poke me, hurt
> me, right?
>
> GILBERT REYES:  Nope.
>
> DETECTIVE McCAMISH:  Okay.  Go ahead and just turn that way real
> quick.  So yeah, let me get a picture of that and that way I can run it
> real quick.
>
> GILBERT REYES:  (Inaudible) numbers.

DETECTIVE McCAMISH:  Oh, I know, right?  All right.  So a couple of things.  One, he's being given the warning for not having the headlights on driving through the lot.  We get a lot of crashes and stuff because people don't have their headlights on and stuff.

GILBERT REYES:  Right.

*Id.* at 8:08-9:11.

## 2.  Another Reason for the Stop: First Conversation

DETECTIVE McCAMISH:  But there's another reason that I'm up here.

GILBERT REYES:  Okay.

DETECTIVE McCAMISH:  Okay?  Do you want to talk to me about what happened inside with the transaction?  It's totally up to you.

GILBERT REYES:  What happened?

DETECTIVE McCAMISH:  Well, do you want to give me your side of what happened?

GILBERT REYES:  Nothing happened in there.

DETECTIVE McCAMISH:  Nothing happened?  Okay.  So what it is is the items that you wanted to buy -- okay -- when you went through self-checkout --

GILBERT REYES:  Okay.

DETECTIVE McCAMISH:  -- that's what I'm asking you about, like, why -- if you don't have them, I mean, what happened?

GILBERT REYES:  I didn't buy nothing.

DETECTIVE McCAMISH:  You didn't buy anything?

GILBERT REYES:  No.

DETECTIVE McCAMISH:  Okay.  All right.  So, again, up to you if you want to talk, but are you saying that you didn't buy those or you didn't try to buy those?

GILBERT REYES:  No, I didn't buy them.

DETECTIVE McCAMISH:  You didn't buy them?

GILBERT REYES:  No.

DETECTIVE McCAMISH:  Okay.  What happened with the transaction, with trying to get it to go through?

GILBERT REYES:  I didn't buy them.

DETECTIVE McCAMISH:  What's that?

GILBERT REYES:  I didn't get them.

DETECTIVE McCAMISH:  Yeah, I was just wondering why.

GILBERT REYES:  I didn't want to get them.

DETECTIVE McCAMISH:  You didn't want to get them?  Okay.  So did the transaction just not go through with the credit card?

GILBERT REYES:  I didn't have a credit card.

DETECTIVE McCAMISH:  With the way were you trying to pay.  I'm not talking about a physical, like, credit card or anything like that; but with that --

GILBERT REYES:  Okay.

*Id.* at 9:12-11:07.

### 3.    "I'm A Detective"

DETECTIVE McCAMISH: Okay.  Because here's the thing.  Obviously I'm a detective.

GILBERT REYES:  Yeah.

DETECTIVE McCAMISH:  Okay?  So it's more than just me pulling you guys over for the headlights.

GILBERT REYES:  Yeah.

9

DETECTIVE McCAMISH:  You guys just didn't have the headlights on, and that was just more reason for me to pull you guys over.  But what it is is honestly -- and I'm just looking for the truth as to what's going on and -- because I've already got phone calls from two different places about two different places you went to.  Okay?

GILBERT REYES:  Me?

DETECTIVE McCAMISH:  You guys.  Okay?  So think about it.  Why would a detective be talking with you?  Right?  Okay.  So obviously I know that there's stuff going on.  All right?  So do you want to step away from the vehicle a bit more so we can talk?

GILBERT REYES:  Sure.

DETECTIVE McCAMISH:  Just so that your buddies aren't listening?

GILBERT REYES:  All right.

DETECTIVE McCAMISH:  So what's happening?  I'm not stupid, man.  I mean, are you on hard times?  What's going on?

*Id.* at 11:08-12:10.

### 4.    "Can I Be Honest With You?"

GILBERT REYES:  Can I be honest with you?

DETECTIVE McCAMISH:  Mm-hm.

GILBERT REYES:  100 percent?

DETECTIVE McCAMISH:  I'm --

GILBERT REYES:  You'll be honest with me?

DETECTIVE McCAMISH:  I will be 100 percent honest with you, bud.

*Id.* at 12:11-17.

### 5.    "I'm Arrested?"

GILBERT REYES:  I'm arrested?

DETECTIVE McCAMISH:   What are -- no.   Right now, we're just talking.   We're --

GILBERT REYES:   I'm going to be arrested after this?

DETECTIVE McCAMISH:   You -- maybe not.   What do you think? Maybe?  Maybe not?  What do you think?

GILBERT REYES:   What I think?

DETECTIVE McCAMISH:   Yeah.

GILBERT REYES:   I think yes.  What do you think?

DETECTIVE McCAMISH:   I think maybe, maybe not.  I think you want to be honest with me, right?

GILBERT REYES:   Yeah.

DETECTIVE McCAMISH:   Okay.

GILBERT REYES:   I don't want to go to --

DETECTIVE McCAMISH:   I can do -- I can see what I can do, but it's going to depend on all of a sudden if that guy says you murdered somebody --

GILBERT REYES:   No, no.

DETECTIVE McCAMISH:   Do you see what I'm saying?

GILBERT REYES:   Yeah.

DETECTIVE McCAMISH:   If I make a promise to say that you're -- that nothing is going to happen and then all of a sudden I find out something different --

GILBERT REYES:   No, no, nothing different.   No, I was trying to do something; but it didn't work.

*Id.* at 12:18-13:24.

### 6.   *Miranda* Warnings

At this point, Detective McCamish gave Mr. Reyes his *Miranda* warnings. *Id.* at 13:25-15:01. Just before Detective McCamish read Mr. Reyes the *Miranda* warnings, Mr. Reyes said, "I already know them." *Id.* at 14:04. Mr. Reyes confirmed that he understood each right after each was read. *Id.* at 14:11-15:01. Detective McCamish then asked Mr. Reyes whether he was willing to answer questions and he replied that he was. *Id.* at 15:02-06. After Detective McCamish completed the *Miranda* warnings, he asked Mr. Reyes the following direct question:

> DETECTIVE McCAMISH: Okay. Now having those rights in mind as I've just advised you of, are you willing to answer questions at this time about what's taken place?
>
> GILBERT REYES: Yes.

*Id.* at 15:02-06.

### 7.    **Initial Statement**

Mr. Reyes then admitted that he was "trying to use a paper credit card to buy something, but it didn't run through . . .." *Id.* at 15:09-11. Detective McCamish asked him about his motive, whether he was "hitting hard times" and Mr. Reyes denied it, saying that he needed the products because he worked construction in New York. *Id.* at 15:12-23. When Detective McCamish asked him for the name on the card, Mr. Reyes claimed he did not have it anymore and that he threw it out. *Id.* at 15:24-16:14.

Detective McCamish was skeptical, asking him whether he was being honest and urging him to be honest. *Id.* at 16:15-17. Detective McCamish told Mr. Reyes that this could go "different ways" and said, "I think you want to help yourself out,

right?"  *Id.* at 16:20-22.  Mr. Reyes answered that he did not "want to go in cuffs" and

he did not want to "get arrested."  *Id.* at 17:01-04.  Detective McCamish replied:

> No, no, no.  And I understand that you don't want to get arrested, but I
> think the biggest thing is we're trying to be honest with each other and
> figure out what's going on.

*Id.* at 17:05-09.  Mr. Reyes replied, "Yeah, but I want a chance.  I want you to

understand that."  *Id.* at 17:10-11.  He swore to Detective McCamish that he would

"never ever in [his] life come back and do something stupid like that ever."  *Id.* at

17:15-17.  Detective McCamish replied, "[A]fter we get done talking I will make a

phone call to find out what they want to do."  *Id.* at 17:18-20.  But he asked Mr. Reyes

whether he was going to be able to believe him or just hear lies.  *Id.* at 17:21-23.

### 8.   "I Can Tell You About Myself, Not About Them."

At this point, Mr. Reyes told Detective McCamish, "I can tell you about myself,

not about them."  *Id.* at 18:02-03.  Detective McCamish replied, "Absolutely.  You

don't have to tell me about them."  *Id.* at 18:04-05.  He told Mr. Reyes that "they're

going to be given the same opportunity" and he was "not going to tell them what [Mr.

Reyes] sa[id]."  *Id.* at 18:05-08.  He explained that if they wanted to talk, it would be

"up to them," but if they decided not to talk, they would face "the consequences of

whatever [Detective McCamish was] just going to do."  *Id.* at 18:06-11.  Detective

McCamish again told Mr. Reyes that he would call after their conversation and he

would "let them know [whether Mr. Reyes was] being cooperative or not."  *Id.* at

18:15-17.  He said, however, that "[t]hat makes no guarantee . . .."  *Id.* at 18:17.

### 9.    Gilbert Reyes' Admission

Detective McCamish again asked Mr. Reyes, "So what's going on?" *Id.* at 8:19-20.  At that point, Mr. Reyes made his first true admission: "Yeah, I was trying to buy something with a fake ID . . .." *Id.* at 18:21-22.  Detective McCamish asked whether he had presented a fake driver's license (fake ID) to open an account and then purchase goods from the fake account. *Id.* at 19:02-05.  Mr. Reyes replied, "Yeah." *Id.* at 19:06.  Detective McCamish asked where the account information came from and Mr. Reyes said it came from the "DR, from the Dominican Republic." *Id.* at 19:10-11.  He told Detective McCamish that he had only one cart full of merchandise. *Id.* at 19:12-25.

Detective McCamish asked Mr. Reyes about the fake ID, what name was on the fake ID, and where the fake ID was. *Id.* at 20:15-21:02.  Mr. Reyes told Detective McCamish that the fake ID was in the car, but, presumably because he did not want to signal to the others that he was talking to the police, he wanted Detective McCamish's assurance that he would not go directly to the car to look for it. *Id.* at 21:03-15.  After Detective McCamish promised not to go directly to the car, Mr. Reyes told Detective McCamish that the fake ID was under his seat. *Id.* at 21:16.  Mr. Reyes told Detective McCamish that he had been to two stores that morning and had opened the account at another Home Depot store, but he could not recall or did not know the location of the first store where he opened the account. *Id.* at 22:18-23:20.  Mr. Reyes then gave Detective McCamish his correct name, residence, and date of birth. *Id.* at 24:02-25:02.  Mr. Reyes admitted that the merchandise from his first purchase,

14

including "drills and stuff," was in the car.  *Id.* at 25:06-16.  He also specified where the fake ID was in the car and agreed to go retrieve it.  *Id.* at 26:01-27:20.

Detective McCamish then spoke with a co-defendant, Jeremy Pinales-Diaz.  *Id.* at 27:22-24.  He engaged in an extensive discussion with Mr. Pinales-Diaz and then spoke with Mickey Mejia Rosario.  *Id.* at 27:25-54:24.  Notably, Detective McCamish read the *Miranda* rights to Mr. Mejia Rosario, and after Mr. Mejia Rosario asserted his right to counsel, Detective McCamish stopped questioning him.  *Id.* at 51:07-53:25.

### 10.  **Gilbert Reyes' Cellphone**

After he had spoken to Mr. Pinales-Diaz and Mr. Mejia Rosario, Detective McCamish returned to Mr. Reyes and asked about his cellphone.  *Id.* at 54:25-55:01. Mr. Reyes gave Detective McCamish his security code so that the Detective could access his cellphone.  *Id.* at 55:02-56:16.

### 11.  **Admission to Another Officer**

At this point, an unidentified officer appeared on the scene.  *Id.* at 56:14-15. Detective McCamish informed the other officer that Mr. Reyes had been read his rights and had been "totally cooperative."  *Id.* at 56:04-19.  Detective McCamish said that they were taking the others away because they did not want them knowing what Mr. Reyes was saying.  *Id.* at 56:19-21.  The other officer asked Mr. Reyes what was going on.  *Id.* at 56:23-25.  Mr. Reyes told this officer about using a fake ID to get a credit card.  *Id.* at 57:01-06.

### 12. The Automobile

Detective McCamish asked Mr. Reyes about the automobile he and his friends were in. *Id.* at 60:07-08. Apparently, when the police ran the plate, it came up as "nonfiled." *Id.* at 60:10-14. Mr. Reyes said that the owner was a "friend," but he said he did not know his name, just a nickname. *Id.* at 60:09-24.

### 13. Personal Conversation

Detective McCamish and Mr. Reyes then engaged in a personal conversation. *Id.* at 62:03-65:06. Detective McCamish said that he wanted to move to Tennessee where it is warmer. *Id.* at 62:13-16. Mr. Reyes said that, even though he is an American citizen, he was born in the Dominican Republic and wanted to move back there. *Id.* at 62:08-17. He also told Detective McCamish that he was studying at Bronx Community College and wanted to finish his degree with hopes to concentrate in architecture. *Id.* at 63:23-64:20. He told Detective McCamish that he had no children. *Id.* at 64:21-23.

### 14. A Third Admission

At this point the unidentified officer re-entered the conversation.[5] *Id.* at 65:08-10. Mr. Reyes told this officer that they had been to "three or four" Home Depot stores in Maine, but they were able to open cards in only one store. *Id.* at 65:24-66:07. Mr. Reyes said that they did not open a new credit account in the Auburn, Maine, store,

---

[5]     The officer said that he was from the Secret Service. *Id.* at 65:08-10. He could be Tyler Martin, the Secret Service Agent who conducted the later interview, but he is not otherwise identified in the traffic stop transcript. Yet, if Agent Martin was the person at the scene on November 26, 2019, it is odd that he did not reintroduce himself on January 15, 2020, when he interviewed Mr. Reyes at the Auburn Police Department. Whether the secret service agent on November 26, 2019, was Agent Martin, however, is immaterial to the Court's analysis.

but he was trying to use the temporary account he obtained elsewhere in the Auburn store. *Id.* at 66:08-23. Mr. Reyes told this officer that the driver did not open any accounts and the other passenger opened one other account but did not use it. *Id.* at 66:24-67:07. Mr. Reyes said they came straight to Maine. *Id.* at 68:11-15. This officer asked Mr. Reyes why they chose Maine and suggested that it might be because "we're redneck hicks." *Id.* at 68:16-17. Mr. Reyes replied, "Like, exactly." *Id.* at 68:18. Detective McCamish confirmed to the other officer that Mr. Reyes had retrieved his "stuff" from the car and had given it to Detective McCamish, and Mr. Reyes agreed. *Id.* at 69:13-24.

Both Detective McCamish and the other officer asked Mr. Reyes about the driver's involvement and Mr. Reyes said the driver did not have a fake ID. *Id.* at 70:10-16. Mr. Reyes confirmed that all three of them are from the same place in the Dominican Republic. *Id.* at 72:13-15. The two officers and Mr. Reyes began to discuss the weather in Maine and New York City. *Id.* at 73:17-74:18.

The other officer asked Mr. Reyes whether he had ever been arrested. *Id.* at 77:11. Mr. Reyes told the officer that he had been arrested four or five years before as a juvenile but the case was sealed. *Id.* at 77:12-24.

The other officer asked about how much money the group had and when Detective McCamish said that he had learned the driver kept the money, the officer said, "He's the ringleader. You're protecting him." *Id.* at 78:14-25. Mr. Reyes denied it. *Id.* at 79:01. Upon further questioning from the other officer, Mr. Reyes denied that they ever had any guns in the car. *Id.* at 79:02-08. Mr. Reyes admitted that he

17

bought the tools by credit card and the total price was $4,500.  *Id.* at 79:11-21.  Mr. Reyes did not recall in which one of the stores he had made the purchase but offered, "Maybe the second I think."  *Id.* at 79:22-80:01.

### 15.    Impounding the Automobile

Detective McCamish referred to impounding the vehicle.  *Id.* at 82:15. Detective McCamish said that whoever picks up the vehicle will have to have a driver's license and Mr. Reyes said that he had a license.  *Id.* at 82:17-24.  But Detective McCamish explained that whoever owns the vehicle will have to authorize the driver to take it after it is released from impoundment.  *Id.* at 82:25-83:11.

### 16.    Discussions about the Booking Process, Including Bail

Detective McCamish explained to Mr. Reyes the process that will follow, including his being bailed.  *Id.* at 83:14-25.  Detective McCamish said that he would tell the bail commissioner about Mr. Reyes' cooperation and Mr. Reyes replied, "Yeah, bring that up.  Yeah."  *Id.*  Detective McCamish and Mr. Reyes discussed generally the setting of bail and when Mr. Reyes might be taken before a judge.  *Id.* at 84:01-21.  Mr. Reyes asked about being allowed to make a call, and Detective McCamish told him that he would be allowed to make a call at the police station.  *Id.* at 84:22-85:05.  At one point, it appeared that Detective McCamish placed Mr. Reyes in his cruiser and they headed to the police department.  *Id.* at 88:07-92:15.  On the way into the station, Detective McCamish told Mr. Reyes that he would mention to the bail commissioner that Mr. Reyes had been "highly cooperative, [Mr. Reyes] didn't give [the Detective] a hard time, that [Mr. Reyes had] been upfront about what took

18

place." *Id.* at 94:10-14.  Detective McCamish later commended Mr. Reyes for having

"manned up." *Id.* at 98:05-06.  The remainder of the recording is a somewhat garbled

conversation with a third party, with occasional comments from Mr. Reyes, largely

about the booking process, bail, and the status of the motor vehicle.  *Id.* at 98:07-

115:02.

### B.    The Agent Tyler Martin Interview

#### 1.    Pat Down and Detention Status

On January 15, 2020, Mr. Reyes was arrested on the federal arrest warrant

when he appeared at the Auburn Police Department to retrieve his personal effects.

The video and the transcript reveal that on January 15, 2020, at approximately 4:44

p.m., Agent Martin together with another unidentified officer entered the interview

room where Mr. Reyes was being held.  *Martin Interview Tr.* at 1.  Agent Martin

patted down Mr. Reyes for weapons and Agent Martin and the other officer briefly

discussed Mr. Reyes' detention status.  *Id.* at 1-2.  The other officer left apparently to

check on Mr. Reyes' exact detention status.  *Id.* at 2.

#### 2.    Pre-*Miranda* Warning Conversation

Agent Martin introduced himself as a Secret Service Agent and asked Mr.

Reyes whether he had ever previously dealt with a federal agent.  *Id.*  Mr. Reyes

confirmed that he had not.  *Id.* at 3.  Agent Martin informed Mr. Reyes that the

interview was being videotaped and recorded for his safety and for Agent Martin's

safety. *Id.* Agent Martin and Mr. Reyes then engaged in the following exchange,

leading up to Agent Martin giving Mr. Reyes the *Miranda* rights:[6]

> SATM: Um, while dealing with a federal agent I have, there's nothing
> to hide from me here, okay?
>
> GR: Okay.
>
> SATM: I'm going to be very upfront with you and I expect you to do the
> same. Uh, with that being said, you don't have to speak with me uh in
> any regard and I uh go through the whole process like I did with with
> Jerem[]y as well. Um, but also at the same time, I like to let you know
> what I already know and then hopefully we can work together and figure
> out what it is you want to talk with me about. Okay?
>
> GR: Okay.
>
> SATM: Um, with that being said, you are currently being charged with
> a single count of conspiracy to to commit uh identity theft. Okay. That's
> all you're being charged with at this point. Um Jeremy had questions
> about the process, essentially you will be housed in county jail tonight,
> on a federal detainer. Tomorrow morning, uh, me and my coworkers
> will go pick you and Jeremy up, we're gonna transport you to federal
> custody, you will be process in federal custody which is in Portland,
> Maine, and you will have first appearance court. I don't know the time
> or who who it's gonna be, um, where you'll basically, you'll except, uh,
> they'll uh explain the charges to you, what your rights are, and all those
> things. With that being said, while you're in federal custody, you'll have
> someone from the court come interview you and talk to you. Has nothing
> to do with the case. It's more just who you are and your personal
> information. Okay?
>
> GR: So my house?
>
> SATM: Not at your house. This will be in court.
>
> GR: Oh, okay.
>
> SATM: Yes, then when you face the judge, that's where the decision
> whether or not to give you bail or to to [remand] you into state, into

---

[6] The Court occasionally changed the punctuation in the transcript to make it more faithful to the audio of the conversation and thus more accurate.

federal custody will happen.  I don't see any reason why they won't give you bail.  Uh that's not my decision, right.  That's—that's not me.

GR:  Bail?

SATM:  Bail out.  So you can get out.  You'll be, you should be.

GR:  On bail.

SATM:   Federal they make that determination depending on your finances, all kinds of things, okay.  What I am saying is you could be released tomorrow; you could be detained tomorrow.  Uh I don't know is is basically the answer to that question.  That's not my wheel[]house.  Um, but what I would like to talk to you about and explain to you is one the nature of what happened in November, your relationship with Mickey and Jeremy.  Um kind of walk me through what happened, if you so choose, right.  And this is the other thing: I want to make sure it's clear um you don't have to answer any of my questions, and I will still answer your questions to the best of my ability.  You can also cho[o]se to answer certain questions and not others.  Right.  Uh, you don't have to, you know, uh.  If, if you say I wanna talk about Jerem[]y or Mickey but I don't want to talk about me, that's fine, right?

GR:  Nah [UI].

SATM:  Either way, whatever it is it's fine.  Okay, I'm just examples.  Um with that being said, um, I understand that you are from the Dominican Republic, and no, no disrespect.   Are you comfortable speaking to me in English?

GR:  Yeah, sorry.

SATM:  And you feel confident that you understand what I'm saying to you?

GR:  Yeah.

SATM:  Okay, if at any point, you don't and I say something and you're like, "hey, I don't know what that is . . ."

GR:  I'll ask you.  Don't worry.

SAMT:  Please ask me.  Okay?  With that being said, have you ever been read your Miranda rights?  Do you know what Miranda rights are?

GR:  Um yes.  But I've never been read them.

SAMT:  You, you do know what they are though?

GR:  When they arrest you?

SAMT:  Yup.

GR:  Yeah, well I yeah, I—I have been—I have been read it.

SAMT:  Okay, so it's more specifically when they ask you questions.  Um because there's certain rights that you have that—that you can use whenever you want, right?  You can also cho[o]se to work with—answer my questions.  Uh, the one thing[] I will explain that's a little different [than] the state and local law enforcement is with federal law enforcement, if you are cooperative—you accept responsibility things like that—it can give you points in a positive way.  It can work on your behalf, okay?  Um, because everything in the federal system is points right.  And so it doesn't hurt you in, in regards to the points uh systems is regarding.  Okay.  Uh, states and locals doesn't work that way, right.  They don't.  Doesn't matter.

GR:  Yeah.

SAMT:  So there is a little bit of a difference.  Uh, with that being said, also not answering my questions doesn't hurt you.

GR:  Okay.

SAMT:  Okay, so just, I like to make that very clear.

GR:  Thank you.

SAMT:  Um, but we'll go into that.  Um, well actually let me back it up.  So, with that being said, before I read you your Miranda rights, I'm letting you know what I wanna talk about.  Okay, so you don't have any confusion about what, what that is . . . .  So when you were first arrested, you provided your passcode to your phone to the detective [who] was questioning you.  Um, we have since obtained a search warrant for your phone, and we were able to get—use—utilizing the passcode you gave me, go into your phone.  So that shows there's a level of cooperation, right.  I really wanna specifically talk about these two text messages.  One is with Jeremy, well who was classified as Jerem[]y Bro.  And the

other one is with someone that you had saved as work one and this number.  I am not asking you any questions about it . . . . These are two things I'd like to talk to you about and also just the nature of Mickey's involvement, Jeremy's involvement.  Uh, then we can kinda go from there if you're comfortable.

*Id.* at 3-5.

At this point, Agent Martin read Mr. Reyes his *Miranda* rights and Mr. Reyes affirmed that he understood each one.  *Id.* at 5-6.  At the end, Agent Martin asked Mr. Reyes a general question about whether he understood each right and whether he wished to answer questions without a lawyer present, and Mr. Reyes responded affirmatively.  *Id.* at 6.

### 3.    The Interview

The interview took place in an interview room with an institutional table and three chairs.  *Martin Interview*.  Mr. Reyes came into the interview room wearing a winter coat.  *Id.*  He was wearing handcuffs, placed so that his hands were in front of him.  *Id.*  Agent Martin informed Mr. Reyes that he was interested in knowing how Mr. Reyes got the information that allowed him to create a false ID.  *Id.*  Also, before the questioning began about the Home Depot incident, Agent Martin made it clear to Mr. Reyes that he could not lie during the interview.  *Id.*; *Martin Interview Tr.* at 6. Mr. Reyes replied: "If I don't want to answer, it is better for me not to answer than to lie."  *Martin Interview Tr.* at 6.

The interview then proceeded and was conversational in tone.  *Id.* at 6-38. Agent Martin did not threaten Mr. Reyes and went about obtaining information about the details of the crime.  The discussion was wide-ranging with talk about how he

came to know both Jeremy and Mickey, the food in the Dominican Republic, Mr. Reyes' plans for education and employment, and his hopes to return to the Dominican Republic at some point. *Id.* at 11-15. Significantly, Mr. Reyes periodically told Agent Martin that he would not discuss certain areas of inquiry. He told Agent Martin that he would discuss one text message but not another. *Id.* at 7. Agent Martin asked him about Mickey's involvement and at one point, he replied, "I'd rather not answer." *Id.* at 10. When he declined to answer, Agent Martin did not press him for an answer. *Id.* Later, Agent Martin asked him about an incident in New Hampshire and he replied, "I don't want to talk about nobody else." *Id.* at 21. Agent Martin did not press him to answer the question. *Id.* On a fourth occasion during the interview, Mr. Reyes declined to answer questions about others when he was asked about people up the ladder from him. *Id.* at 32. Agent Martin again did not press him. *Id.* Toward the end of the interview, he asked to be allowed to call his mother and Agent Martin allowed Mr. Reyes to have a brief conversation with his mother. *Id.* at 34-35.

## V.   DISCUSSION

### A.   The Burden of Proof and Voluntariness Standards

Mr. Reyes asserts in his reply memorandum that because this investigation began as a Maine state investigation, "it is reasonable to assert that Maine Law relating to investigative techniques should be seen as highly relevant if not even controlling in this circumstance." *Def.'s Reply* at 3. Citing *State v. Wiley*, 2013 ME 30, 61 A.3d 750, and *State v. Collins*, 297 A.2d 620 (Me. 1972), Mr. Reyes observes

that "Maine Law is more stringent relating to the voluntariness of statements than Federal Law relating to promises and inducements." *Id.*

The Court is not clear what Mr. Reyes is claiming. He discusses Maine law on "investigative techniques," says that Maine law is "more stringent" than federal law "relating to the voluntariness of statements . . . relating to promises and inducements." Although he cites two Maine cases, he does not attempt to apply those facts to the facts or law in this case. The Court could disregard his argument because it is so undeveloped that it is unclear exactly what Mr. Reyes is claiming and because Mr. Reyes makes this new argument in his reply, which does not respond to an argument made by the Government and effectively prevents the Government from responding.

In an effort to be fair to Mr. Reyes, the Court considered both whether there are differences between Maine and federal law regarding the voluntariness of confessions, and, if so, whether the differences matter in this case. Mr. Reyes is correct that Maine law imposes a "beyond a reasonable doubt" burden of proof on the state to demonstrate that a defendant's statements were voluntary. In 1972, in *Collins*, the Maine Supreme Judicial Court imposed the standard of beyond a reasonable doubt in determining whether the state had met its burden in demonstrating that a confession was voluntary. 297 A.2d at 627 ("Hence, the presiding Justice . . . must apply the strict standard that the prosecution establish the legal admissibility of a confession by 'proof beyond a reasonable doubt'"). The

Maine standard is nuanced, incorporating both a preponderance of the evidence and a beyond a reasonable doubt standard:

> The admissibility of defendant's statements requires a finding by a preponderance of the evidence that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, *see State v. Bleyl*, 435 A.2d [1349, 1358 (Me. 1981)], and that his statements were voluntary beyond a reasonable doubt, *see* [*Collins*, 297 A.2d at 627].

*State v. Gosselin*, 594 A.2d 1102, 1105 (Me. 1991).  By contrast, the First Circuit standard for evaluating voluntariness is a preponderance of the evidence or "more likely than not."  *Carpentino*, 948 F.3d at 26 ("An inquiring court must start with a presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence").

In addition to burden of proof, this District has noted, "Article I, § 6 of the Maine Constitution is more protective of a defendant's rights in the voluntariness context than are the Fifth and Fourteenth Amendments to the United States Constitution."  *Barnes v. Merrill*, Civ. No. 02-55-B-S, 2002 U.S. Dist. LEXIS 10810, at *11 n.2 (D. Me. Jun. 14, 2002), *aff'd*, *Order Affirming Recommended Decision*, *Barnes*, 1:02-cv-00055-GZS (D. Me. July 1, 2020), ECF No. 7.  Specifically, the Maine Law Court "does not require proof of police coercion as a necessary prerequisite to an involuntariness finding."  *Id.  Barnes* explained:

> Maine's notion of "voluntariness" incorporates a traditional due process analysis focused upon the confession under examination that has to be proven beyond a reasonable doubt to be "the product of a rational intellect and a free will," [*Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)], free from the taint of interrogation tactics or other government actions that are improper in the particular circumstances.

*Id.*

*Barnes* also stated that "voluntariness" under Maine case law carries with it the notion that the statement has not been "compelled" by any improper motivation from within the defendant himself.   Thus under Maine law a defendant's senile dementia can provide a constitutional basis for the exclusion of his statement.   *Id.*

The Court does not know which of these differences between Maine and federal law, Mr. Reyes is proposing the Court should apply to his case.   There is no evidence that Mr. Reyes was senile or had some other condition "from within himself" that rendered his confession involuntary.   It could be that Mr. Reyes is arguing that, applying Maine law, the interrogation techniques used by law enforcement tainted his confession and, focusing on the "rational intellect and . . . free will" standard, the confession should be suppressed.   However, the Court does not conclude that this distinction between federal and Maine law would change its decision in the facts of this case.   *See State v. Kittredge*, 2014 ME 90, ¶ 28, 97 A.3d 106 ("[G]eneralized and vague statements that [a suspect] should cooperate because it might help him with the district attorney's office do not constitute impermissible offers of leniency").   Finally, he might be arguing that the Court should apply the "beyond a reasonable doubt" standard to his motion to suppress; however, applying a "beyond a reasonable doubt" standard, the Court would arrive at the same result.

But there is a more fundamental reason for rejecting Mr. Reyes' argument. Assuming any of this would make a difference in the ultimate disposition of this motion, Mr. Reyes has not explained why a federal court should apply state law in a criminal case pending in federal court charging a violation of a federal statute or why

27

a federal court should apply the provisions of the Maine Constitution, not the United States Constitution, to such a case. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Mr. Reyes cites no authority for his novel proposition that a federal court presiding over a federal criminal case must apply state substantive, procedural, and constitutional provisions to the federal charge because state authorities made the initial arrest and started the investigation before the case was charged federally. Mr. Reyes' argument would represent an unwarranted sea change in the relationship between the federal and state governments. This Court understands that in federal criminal cases, it is duty-bound to apply federal law as directed by the United States Supreme Court and the Court of Appeals for the First Circuit, and it rejects Mr. Reyes' argument to the contrary. Even so, as the Court discusses, given the circumstances revealed by the transcripts and video in this case, the Court would conclude that the statements comply with the higher Maine standards.

## B.   The Voluntariness of the Arrest Interview

Having set forth the details and sequence of the interactions between Detective McCamish and Mr. Reyes, it is difficult to credit the premise of Mr. Reyes' motion to suppress the contents of the arrest interview. In his motion, Mr. Reyes claims that he made "inculpatory statements after being informed that he would receive substantial benefits if he admitted his conduct." *Def.'s Mot.* at 1. The transcript simply does not corroborate Mr. Reyes' claim. Other than promising to Mr. Reyes that he would be honest with him and that he would "see what [he could] do," *Traffic Stop Tr.* at 12:15-17, 13:11-12, Detective McCamish made no offer of any benefits at

all before Mr. Reyes began talking to him.  Mr. Reyes' legal theory is not supported by the facts.

Furthermore, before Mr. Reyes made any admissions, Detective McCamish read the *Miranda* warnings to him and the transcript establishes that Mr. Reyes confirmed that he understood his rights.  *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession.  But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare"); *United States v. Washington*, 431 U.S. 181, 188 (1977) ("[I]t seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled").

In *United States v. Jacques*, 744 F.3d 804 (1st Cir. 2014), the First Circuit listed some factors that a court could consider in determining whether the government had met its burden of proof.  The *Jacques* Court stated that

> [r]elevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs.  They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system.  A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary.

744 F.3d at 809 (internal citations omitted).

Here, the Court finds that Mr. Reyes' waiver was knowing and voluntary.  Just before Detective McCamish read the *Miranda* warnings, Mr. Reyes said that he

already knew them. Detective McCamish stopped after each right and expressly asked Mr. Reyes whether he understood the right and Mr. Reyes confirmed that he understood each right. After Detective McCamish completed the *Miranda* reading, he asked Mr. Reyes whether having the rights in mind that the Detective just read, Mr. Reyes was willing to talk to him and Mr. Reyes replied that he was. There is simply no suggestion in this interview transcript that Mr. Reyes did not understand his *Miranda* rights, including the right to remain silent, or that he did not affirmatively waive those rights. Nor is there any indication that Detective McCamish made any promise or inducement that overbore Mr. Reyes' will.

It is true that this interview took place outside in a parking lot during a cold late November day in Maine. Mr. Reyes' custodial status at the time he initially spoke to Detective McCamish and admitted the essence of his conduct seems more like a *Terry*[7] stop than an arrest, especially since Detective McCamish expressly told Mr. Reyes that he was not under arrest but might (or might not) be arrested in the future. Nevertheless, in lenity to Mr. Reyes, despite Detective McCamish's disavowal, the Court will assume that at the time he made the statements, "a reasonable person, in the suspect's position, would feel the degree of restraint normally associated with formal arrest." *United States v. Candelario-Santana*, 834 F.3d 8, 18 (1st Cir. 2016) (quoting *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994)).

---

[7]     *Terry v. Ohio*, 392 U.S. 1 (1968).

Turning to the other *Jacques* factors, Mr. Reyes was twenty-one years old as of November 2019. *Traffic Stop Tr.* at 24:21-23, 106:19-23; 109:19-20. He had graduated from high school and was attending Bronx Community College, studying liberal arts with aspirations to become an architect. *Id.* at 63:19-64:18. He had had some, though not extensive, history with the criminal justice system. *Id.* at 77:11-24. Mr. Reyes made admissions early during his encounter with Detective McCamish, so he was not worn down into confessing his role. He was lucid and calm throughout the interview, which was generally conversational. In fact, Mr. Reyes and Detective McCamish discussed the weather in Maine and New York City, their marital situations, families, and other non-investigative topics during the interview. Although Mr. Reyes was concerned about whether he would be arrested, Detective McCamish made no promises that he would not be arrested if he talked. Finally, he generally drew the line between talking about his own involvement and the involvement of others.[8]

---

[8]     The Court does not know quite what to make of Mr. Reyes' argument that Detective McCamish's statements to a co-defendant reveal Detective McCamish's intentions and should be held against the Government in assessing Detective McCamish's statements to Mr. Reyes. *Def.'s Reply* at 2. First, Mr. Reyes would not have standing to raise for the other suspect whether Detective McCamish's statements to the other suspect made the other person's statements to the police legally infirm. Second, there is nothing in the transcript of the traffic stop conversations that suggests that Mr. Reyes was aware of what Detective McCamish was saying to the co-defendant. To the contrary, Detective McCamish moved Mr. Reyes away from the other suspects. Third, except for the "deliberately elicit" standard not applicable here, the legal standard typically focuses on the suspect and whether the suspect waived constitutional rights, not the officer and what the true intentions of the police office were. *See Torres v. Dennehy*, 615 F.3d 1, 6-7 (1st Cir. 2010) (discussing the "deliberately elicit" standard). The First Circuit has written that "a waiver is made voluntarily if the waiver is 'the product of a free and deliberate choice rather than intimidation, coercion and deception.'" *Carpentino*, 948 F.3d at 26 (quoting *United States v. Sweeney*, 887 F.3d 529, 535-36 (1st Cir. 2018)). Fourth, the timing is wrong. Mr. Reyes was given *Miranda* warnings and made most of his admissions before Detective McCamish spoke to the other suspect. Fifth, the Court concludes that Detective McCamish's statements to the other suspect are similar to statements of police encouragement that the First Circuit has concluded do not render a statement involuntary. *See id.* at 28. Finally, the First Circuit has stated that the trial court must take into account all the circumstances and, if the Court

Starting with the presumption that Mr. Reyes did not waive his rights, *see Carpentino*, 948 F.3d at 26,  the Court finds that the Government has established it is more likely than not that Mr. Reyes waived his constitutional rights when he spoke to law enforcement after receiving *Miranda* warnings after the traffic stop on November 26, 2019.

## C.    The Voluntariness of the Agent Tyler Martin Interview

The Court next discusses Mr. Reyes' arguments about the voluntariness of his statements to Agent Martin in the Auburn Police Department on January 15, 2020, after the federal charge had been initiated against Mr. Reyes.[9]  Mr. Reyes first argues that the taint from the illegal traffic stop interview infected the January 15, 2020, interview.  As the Court has determined that Mr. Reyes knowingly, intentionally, and voluntarily waived his constitutional rights at the traffic stop interview, his argument about the taint from the first interview must fail.

Although the argument is not explicitly pressed, the Court turns to whether Mr. Reyes' statements to Agent Martin on January 15, 2020, were voluntary.  The Court applies the same analysis to this question as it did to the traffic stop interview.

_____

includes and considers Detective McCamish's statement to the other suspect among all the circumstances, the comments do not change the Court's determination that Mr. Reyes waived his constitutional rights in a knowing and voluntary manner.

[9]      The United States Supreme Court has long held that once indicted, a defendant has the right to counsel under the Sixth Amendment.  *See Patterson v. Illinois*, 487 U.S. 285, 290 (1988); *Brewer v. Williams*, 430 U.S. 387, 398-401 (1977); *Massiah v. United States*, 377 U.S. 201, 205-07 (1964).  Thus, it is plain that Mr. Reyes had the right to counsel on January 15, 2020, when Agent Martin approached him at the Auburn Police Department.  At the same time, under the law, Mr. Reyes could waive his right to counsel so long as the waiver was knowing, intelligent, and voluntary.  *Patterson*, 487 U.S. at 292-93; *Fellers v. United States*, 540 U.S. 519, 523 (2004).  The Court's attention is focused on whether Mr. Reyes voluntarily waived his right to counsel, not whether he had the right to counsel to begin with.

32

Agent Martin gave Mr. Reyes *Miranda* warnings in accordance with *Carpentino*. Thus, the Court focuses on the next question: whether, applying the same *Carpentino* standards described above, Mr. Reyes knowingly and voluntarily waived his constitutional rights after Agent Martin read him the *Miranda* warnings.

For many of the same reasons that applied to the traffic stop interview, the Court concludes that Mr. Reyes knowingly, intelligently, and voluntarily waived his constitutional rights on January 15, 2020, and spoke with Agent Martin.  Mr. Reyes was still twenty-one years old as of January 15, 2020.  He was a high school graduate and had attended Bronx Community College with hopes to become an architect.  He was comfortable speaking English.  He had some, but not a great deal of, experience with the criminal justice system, although presumably his knowledge of the criminal justice had been enhanced by his recent exposure to the state criminal justice process.

Before he was given the *Miranda* warnings, Agent Martin informed Mr. Reyes that under the federal system, if he cooperated, he could benefit.  At the same time, he informed Mr. Reyes several times that he had a right to say nothing and that his silence would not be held against him.  Agent Martin also instructed Mr. Reyes not to lie.  Under *Carpentino*, "[n]either an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion."  948 F.3d at 28 (citing *Jacques*, 744 F.3d at 809-810; *Bezanson-Perkins*, 390 F.3d at 42-43).

As Agent Martin read Mr. Reyes the *Miranda* warnings, Mr. Reyes affirmatively stated that he understood each right and he expressly agreed to allow

the questioning to proceed without a lawyer.  As noted earlier, despite the *Miranda* warnings, the Government bears the burden of demonstrating that Mr. Reyes knowingly and voluntarily waived his constitutional rights.  *See id.* at 26.  At the same time, a court may take into consideration, among all the factors, a defendant's decision to respond to questions after receiving *Miranda* warnings.  *Berkemer*, 486 U.S. at 433, n.20; *Washington*, 431 U.S. at 188.

Also, as noted above, Mr. Reyes was selective in what he was and was not willing to answer.  By the Court's count, Mr. Reyes declined to answer specific areas of questioning on four occasions during the interview.  From the Court's perspective, Mr. Reyes' decision to answer some, but not all, questions is a hallmark of voluntariness.  If Mr. Reyes knew he did not have to answer some question, the Court finds he also knew, as he was told, that he did not have to answer any questions.

Agent Martin's demeanor throughout the interview was calm and respectful. Agent Martin never raised his voice, badgered Mr. Reyes, or attempted to coerce statements from him.   Similarly, Mr. Reyes was calm, logical, and coherent throughout the interview.

The entire interview was about forty-five minutes long, including the brief telephone conversation between Mr. Reyes and his mother.  This was not an extended, exhausting session where the officer wore down a suspect's resistance over time.  *See United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (en banc) ("We place substantial weight on the fact that [the defendant] confessed after a mere

34

thirty-three minutes.  Thus, this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time").

There is no claim and no evidence that Agent Martin used any form of chicanery or deception during the interview.  *See Jacques*, 744 F.3d at 812 ("Extreme forms of deception or chicanery by the police may be sufficient to render a confession involuntary").

Finally, toward the end of the interview, Mr. Reyes asked for, was given permission to, and did call and speak with his mother, using his own cellphone.  If the interview had been coercive, it is less likely Mr. Reyes would have asked and been granted permission to call his mother.

### D.    Gilbert Reyes' Right to Counsel on January 15, 2020

The Court turns to Mr. Reyes's Sixth Amendment right to counsel at the January 15, 2020, Auburn Police Department interview.  Here, Mr. Reyes raises one direct point, namely that the right to counsel firmly attaches when the federal government initiates the criminal charge.  *Def.'s Mot.* at 2 (citing *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972)).  Mr. Reyes cites *Massiah* for the proposition that a "post-indictment interrogation is a critical stage requiring the presence of counsel."  *Def.'s Mot.* at 2.

The docket reflects that the federal government issued a criminal complaint against Mr. Reyes on December 6, 2019, and the Court issued an arrest warrant that same day.  *Crim. Compl.*; *Arrest Warrant* (ECF No. 10).  On January 9, 2020, a federal grand jury indicted Mr. Reyes and on the same day, the Clerk issued an arrest

35

warrant for him. *Indictment*; *Arrest Warrant* (ECF No. 25). Mr. Reyes was arrested on the arrest warrant on January 15, 2020, and the next day, January 16, 2020, he appeared before the Magistrate Judge and was appointed counsel at the initial appearance. *Min. Entry* (ECF No. 40); *Arrest Warrant Return* (ECF No. 53). Therefore, the rules in *Kirby* and *Massiah* apply and Mr. Reyes had the right to counsel when he spoke with Agent Martin on January 15, 2020. *See Kirby*, 406 U.S. at 689-90; *Massiah*, 377 U.S. at 206 ("We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel"); *Spano v. New York*, 360 U.S. 315 (1959).

The narrow question becomes whether he waived the right to counsel. A defendant, even one like Mr. Reyes who has been indicted, may voluntarily choose to waive the right to counsel. In *Montejo v. Louisiana*, 556 U.S. 778 (2009), the United States Supreme Court wrote:

> Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Patterson*[, 487 U.S. at 292 n.4]; *Brewer*[, 430 U.S. at 404]; *Johnson v. Zerbst*, 304 U.S. 458 . . . (1938). The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. *Michigan v. Harvey*, 494 U.S. 344, 352-53 . . . (1990). And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . . .

*Id.* at 786; *see also Torres*, 615 F.3d at 4.

Again, for the reasons the Court has extensively discussed, the Court concludes that the Government has demonstrated that Mr. Reyes knowingly, intelligently, and voluntarily waived his right to counsel at the January 15, 2020, police station interview. *See Bezanson-Perkins*, 390 F.3d at 39 ("A waiver is voluntary when 'it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception.' A waiver is knowing and intelligent when 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it'" (alteration in original) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986))). In making this evaluation, the Court has started from the presumption that Mr. Reyes did not waive his rights, acknowledged that the Government has the burden to establish that his waiver was knowing, intelligent, and voluntary, and considered "all the circumstances" as required by the First Circuit. *See Carpentino*, 948 F.3d at 26.

## VI.   CONCLUSION

The Court DENIES Gilbert Reyes' Motion to Suppress (ECF No. 68).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 31st day of July, 2020